Filed 12/13/23  In re C.B. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re C.B. et al., Persons Coming Under the Juvenile Court Law. | D082465 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Petitioner and Respondent,<br><br>v.<br><br>Daniel B.,<br><br>Defendant and Appellant. | (San Diego County<br>Super. Ct. No. EJ4552AB) |

APPEAL from orders of the Superior Court of San Diego County, Mark T. Cumba, Judge.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha C. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

Daniel B. (Father) appeals from the juvenile court's orders terminating his parental rights to his minor children, C.B. and L.B., pursuant to Welfare and Institutions Code[1] section 366.26. Father asserts: (1) the juvenile court and the San Diego County Health and Human Services Agency (Agency) did not comply with their inquiry duties under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA), and (2) the juvenile court erred by finding the beneficial parent-child relationship exception did not apply and terminating his parental rights.

As explained below, we conclude: (1) any inadequacy in the ICWA inquiry was harmless error, and (2) the court did not err by finding the beneficial parental relationship exception inapplicable. Therefore, we affirm the court's orders terminating Father's parental rights.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Underlying Incidents*

Two-year old C.B. and three-year old L.B. (together, the Children) were detained following two confrontations between their parents, Father and S.B. (Mother), who were divorced but living together. On August 21, 2020, the first incident occurred when Father became angry with Mother for drinking alcohol. Mother stated that Father punched her in the face multiple times, kicked her multiple times, and pressed his knee into her neck until she became unconscious. As a result, Mother suffered a concussion and spent the night in the hospital.

After the incident, a social worker spoke to Mother at the home while Father was out; Mother stated the domestic violence incident was her fault and wavered between saying she felt safe and unsafe in the home. Following

---

[1] All further statutory references are to the Welfare and Institutions Code.

that visit, Father's sister Debbie P. brought the Children to him at a hotel to attempt to avoid further contact by the Agency.

On August 24, 2020, a social worker interviewed Father, who admitted Mother's drinking made him angry, stated Mother's injuries were unintentional, and denied the occurrence of prior domestic violence. Regarding the August 21 incident, he stated Mother only had a headache, not a concussion, and that his foot was on her shoulder, not her neck.

A social worker also spoke with the Children. C.B. reported that Mother sometimes gets "owies" when the parents are "grumpy" and "fight together," and that she stays out of the room where they are fighting because it would be "bad" to go in. L.B. stated multiple times that Mother is sad.

Based on the allegations of violence and abuse, the social worker offered to take Mother and the Children to the maternal grandparents' home. Mother expressed fear of Father and agreed to leave. While Mother packed, Father became angry; he yelled, hit the social worker's car, and apparently hit Mother's face, causing a new bruise to form near her eye.

At the maternal grandparents' home, Mother consumed alcohol and/or prescription pills and passed out. While the grandfather took Mother to the hospital, the Children were removed and brought to Polinsky Children's Center. After stating she wanted to kill herself, Mother was placed on a section 5150 hold.

While Mother was in the hospital, a social worker spoke with maternal grandfather, who stated: "[Mother] told me that, this weekend, he pushed [L.B.] out of the way to get to her. If they weren't removed last night, I am confident that there would be a moment in time in which something bad would happen to the kids. I am glad they are out of there, but I am afraid that [Mother] will die." He explained Mother intended to remain in a

3

relationship with Father.  Indeed, upon discharge, Mother went home with Father because he was remorseful, expressing a desire to be a better father and a better husband.

B.  *The Petitions and Initial Hearings*

On August 26, 2020, the Agency filed Juvenile Dependency Petitions under section 300, subdivision (b).  The August 21 and August 24 incidents, together with an alleged history of unreported domestic violence, caused concern that the Children faced a substantial risk of serious physical harm.  The court held a detention hearing on August 27, 2020, and found that the Agency had stated a prima facie case for initial removal and continued detention based on that concern.

On August 31, 2020, the court held a hearing to consider placement of the Children and set the matter for trial.  The Children were placed with non-relative extended family members, Michael and Allison M. (together, the Caregivers).

The Agency made family finding efforts and completed a relative search, identifying Kelly B., Eugene B., Barbara B, and Michelle B. as potential relatives.  The Agency sent relative notification letters to these individuals regarding placement of the Children, and none responded.

C.  *Jurisdiction and Disposition Report and Hearing*

Prior to the next hearing, the Agency again interviewed the parents regarding the August 21, 2020, incident.  Father denied having a history of prior domestic violence and minimized the incident, stating the two had engaged in "slap fighting" and he did not realize he slapped her hard enough to hurt her.  However, he admitted he "put her on the floor hoping she would go to sleep" and he "made a mistake" that day.

4

Mother admitted to having an alcohol dependency, blamed herself for the August 21 incident, and denied that Father put his knee on her neck or kicked her, as she had previously described. Based on that incident and the parents' minimization of and lack of accountability for it, the Agency recommended continued detention under section 300, subdivision (b).

On September 22, 2020, the court held a jurisdiction and disposition hearing. The court made a true finding on an amended petition submitted by the parents, declared the Children dependents of the court, found clear and convincing evidence to remove the Children from the parents' custody under section 361, subdivision (c), placed the Children with the Caregivers, and ordered reunification services and supervised visitation for the parents. Both parents participated in developing the case plan and expressed willingness to comply with it.

D. *ICWA*

Throughout the proceedings, the Agency made some ICWA inquiries, and the court addressed the applicability of ICWA. The petitioning social worker initially inquired of Father and Mother regarding the Children's Indian status, and the parents provided no reason to believe they were Indian children. Subsequently, Mother and Father again denied having any Native American ancestry.

In response to an inquiry by the Agency, maternal grandfather and grandmother later denied Native American heritage.

Paternal grandmother likewise denied having Native American heritage. Paternal grandfather stated his family "probably does" have Indian ancestry but further stated that "he has no knowledge of what tribe, what region the tribe resides in, and has no other relatives that would have more information."

5

Father informed the Agency that he has two older sisters, Debbie P. and Keri W., and a younger brother, Kelly B. The Agency inquired whether Keri W. had Native American heritage, and she denied having such ancestry. After Kelly B. did not respond to the relative notification letter, the Agency did not make an ICWA inquiry of him. The Agency did not obtain contact information for Debbie P. even though Father reported having contact with her. Keri W. and her husband Harold W., whom the Agency considered for placement, listed Debbie P. as their emergency contact.

Throughout the case, the court addressed the application of ICWA at each hearing, each time finding that ICWA did not apply.

E. *Six-Month Report and Hearing*

In its six-month status review report, the Agency stated that the Children appeared to be doing well in their placement. The Caregivers reported that C.B. told them about domestic violence she had witnessed in her home.

During this time, Father visited the Children twice a week, progressing to unsupervised visits in February 2021. The Children appeared to "really enjoy spending time with their father." Father also participated in domestic violence classes. Although he expressed being "disgusted" with himself as to how he treated Mother and an understanding that domestic violence can affect the Children, he continued to blame Mother's drinking, deny strangling or hitting Mother on August 21, 2020, and maintain that the Children did not witness any domestic violence.

Mother continued struggling with alcohol and mental health issues. She reported spending a night with Father after drinking. When the social worker questioned him, Father initially denied that Mother had stayed with

6

him. He later called the social worker and admitted to the visit, explaining that he had previously "panicked" when questioned.

At the contested six-month review hearing on April 12, 2021, the court noted the parents had made some progress on the case plan. The court maintained existing placement, visitation, and reunification services and ordered trauma therapy for the Children.

F. *Twelve-Month Report and Hearing*

In its September 2021 report, the Agency wrote that, at random times, C.B. shares with others that "daddy hurt mommy."

During this time, Father continued having regular visits with the Children, during which he showed improved behavior and which the Children enjoyed. He arrived at visits prepared with snacks, water, and a plan for age-appropriate activities, and he was engaged with the Children. Meanwhile, he continued to participate in reunification services, including domestic violence classes. The Agency reported that Father met the Children's needs but expressed concern over his ability to set and maintain boundaries with Mother.

In September 2021, Father asked the social worker why the Children needed trauma therapy. When she explained the Children had experienced trauma by being exposed to domestic violence, seeing their mother in an ambulance, and being removed from their parents, Father became loud, angry, hostile, and aggressive. The Caregiver clarified the Children speak about a hospital, not an ambulance, and Father blamed this discrepancy for his reaction. The Agency expressed concern about the potential effect on his children based on his unacceptable and inappropriate angry and hostile reaction.

Mother continued to struggle with alcohol addiction. Mother completed a 30-day inpatient alcohol abuse program on May 25, 2021. However, in July, she was arrested for driving under the influence, after which her visitation became inconsistent and minimal.

At the contested hearing on November 15, 2021, the court maintained the current placement of the Children and noted Father's significant progress toward the resolution of the causes of the petition. The court ordered liberal overnight visitation between the Children and Father.

G. *Eighteen-Month Report and Hearing*

Leading up to the next review hearing, the Agency reported Father was doing well, completing services, maintaining employment, and consistently visiting the Children, including overnight visits. Father completed his 52-week domestic violence program and received parent education assistance to assist with the transition of the Children back into the home. The Agency reported that the Children were excited to be returned to Father's home.

During this time, Mother participated in some supervised visits but again relapsed on alcohol in January 2022. She reportedly received inpatient psychiatric care due to alcoholism and suicidal ideations.

In February 2022, the court held the 18-month review hearing and adopted the Agency's recommendation to place the Children with Father. Father was not permitted to supervise Mother's visits with the Children or have Mother overnight in his home.

In an addendum report, the Agency continued to express concern about Father's ability to maintain boundaries with Mother. The Agency sought to work with and monitor Father longer.

At the contested hearing on April 6, 2022, the court found substantial progress by Father and some by Mother toward alleviating or mitigating the

causes of the placement. The court ordered the plan of return home with Father to be the permanent plan.

H. *Family Maintenance Report and Hearing*

After the placement of the Children with Father, the Agency reported that the Children appeared happy and healthy. In late May, after C.B. suffered a concussion, a social worker made an unannounced visit to Father's home. Father was out with L.B. C.B. opened the door and told the social worker that the babysitter was watching her. Father arrived and told the social worker that the babysitter was present and using the bathroom. C.B. again told the social worker the babysitter was in the bathroom but "don't go in there." In actuality, Mother was hiding in the bathroom. After the social worker waited for approximately 30 minutes, repeatedly asking whether it was really the babysitter, Father confessed that Mother was in the bathroom. When Father told Mother she could come out, C.B. stated "no, no, no" and started crying.

The Agency expressed continued concern over Father's difficulty maintaining a boundary with Mother between co-parenting and having a romantic relationship. Mother had previously admitted that Father triggers her to drink, and Father had admitted that Mother's alcohol use triggers anger, potentially resulting in the Children witnessing further hostile, violent incidents between them. Because of the concern over Father's ability to maintain boundaries with Mother, the Agency recommended Father receive further Family Maintenance Services.

At a Family Maintenance Review hearing on June 22, 2022, the court ordered placement of the Children with Father. The court permitted supervised visitation by Mother but prohibited Mother from visiting children at Father's home and supervision by Father of her visitation.

I. *Section 387 Petition*

Despite the court's order, in July 2022, L.B. told a social worker that the Children see Mother at night, and they both confessed that someone told them not to tell anyone.

Upon the Agency's investigation, Father denied permitting Mother into his home. He blamed the "system" for damaging his girls and for causing Mother to relapse.

Mother, conversely, stated that Father had permitted Mother to visit the Children in his home two to three times per week in exchange for sexual favors and/or promises of a future relationship. She believed that he offered her money and support to manipulate her. She explained that Father told the Children not to discuss Mother with the social worker.

In support, Mother provided the Agency with text message conversations between her and Father in mid-August 2022. In one conversation, the two planned to take the Children to a waterpark together and discussed and shared photos of the outing afterward. On another occasion, Father invited Mother to his parents' house to see the Children. Father wrote, "Just to be clear I adore and cherish you," and "Fyi I really need ur help with raising these girls of ours." Father wrote that he wanted a future relationship with Mother. When Mother told him she cannot be in a relationship with him right now but wanted to see the Children, Father wrote, "If there is no feelings and no future I can't risk it." He later wrote, "I don't like sex being off the table," which he found "unacceptable." He also wrote, "I'm the only person who has stayed and supported through all of this... I like some understanding, respect and kindness back." He believed he was "[d]ue a lot more than a hug," "[a]t least a f*** a week" and "would take that as payment."

10

The Caregivers, who continued to visit with the Children after they were returned to Father, likewise stated that the Children had indicated they had seen Mother and been told not to share that information. The Caregiver stated that she was concerned for their well-being with Father, and the Children's personalities had become "shells of what they used to be."

Based on the information from the Children and Mother, on August 31, 2022, the Agency applied for and the court issued a protective custody warrant for the Children, and the Agency filed a section 387 petition. The court ordered detention of the Children outside the home, with liberal supervised visitation with the parents.

In anticipation of the section 387 petition hearing, the Agency reported the "extensive history of the father not being truthful with the Agency, repeatedly allowing the mother into his home and demonstrating domestic violence behaviors of control and manipulation." The Agency explained that after the petition, Father informed the social worker that he "hates [Mother] now and there is no possible chance I ever allow her around the [C]hildren again." The Agency believed that his animosity toward Mother would harm his ability to co-parent and fuel further domestic violence incidents. Despite two years of services, the Agency explained, "the parents [have] been unable to effectuate and sustain the long-term behavioral changes necessary for these young children" to have a home with "safety and stability." The Agency additionally reported "while the [C]hildren were in the care of the father, they did appear to lose some of their young, energetic personalities," becoming quieter and less playful during home visits. Consequently, the Agency recommended termination of reunification services and setting a section 366.26 hearing.

On October 19, 2022, the court sustained the section 387 petition, removed custody from Father, terminated reunification services to him, placed the Children in a licensed foster home, and set a section 366.26 hearing to determine permanent placement of the Children.

J. *Section 366.26 Hearing*

After the removal of custody, Father continued consistently visiting the Children, often bringing them toys and food. On at least some occasions, the Children expressed excitement when they first saw Father. During these visits, the Children called Father "Daddy" and enjoyed playing with him. At the end of the visits, the Children ordinarily said goodbye calmly without distress. When Father kissed and hugged the girls goodbye, the girls returned the sentiment. On one occasion, L.B. expressed a desire that Father stay.

During this time, the Children's therapist reported that they do not generally discuss Father, and when they do, they focus on the toys he brings to visits.

The Agency's report on April 13, 2023, states that the relationship between the Children and Father "has a level of strength" based on their positive interactions, but still "the relationship is not substantial." The Children did not name Father when asked with whom they felt safe or include Father in their safe house illustrations. Consequently, the social worker concluded that, although the Children would express sadness or worry if the court terminated Father's parental rights, the relationship "does not outweigh the benefits of adoption such as safety, stability, and a home environment free of violence." The Agency recommended termination of Father's rights.

12

In a May 1, 2023, addendum to that report, the social worker reported that Mother stated that she had been living with Father for eight months and he was "an abusive monster" who engaged in "emotional, verbal, and financial" abuse of her. She believed Father was attempting to maintain parental rights to keep her in his control. Mother expressed her desire that the Children remain with the Caregivers.

Father filed a section 388 petition. Father denied everything Mother had reported and said she had been on a "drunken binge." The court denied the petition, finding that Father had not stated a prima facie case of changed circumstances.

At the section 366.26 hearing on July 18, 2023, the court received stipulated testimony by the Children. L.B.'s testimony included: she would live with Mother, Father, the Caregivers, and C.B. if she could live with anyone; she likes visits from Mother and Father; she would go to Caregivers if she was scared because they take care of her; and she would feel sad not to see Mother and Father anymore. C.B. stated: she would live with the Caregivers and L.B. if she could live with anyone; she enjoys visits with Mother and Father; and the Caregivers are the people who take care of her and keep her safe. When asked if she feels safe with Father and Mother, she did not directly answer, but rather noted a time when Father yelled at her and when Mother was in the house when she was not supposed to be. C.B. did not answer the question how she would feel if she could never see Father or Mother again.

The court terminated parental rights, finding: (1) by clear and convincing evidence based on the Caregivers' representation, the Children were likely to be adopted; (2) by clear and convincing evidence, adoption was in the best interest of the Children; and (3) by a preponderance of evidence,

13

none of the section 366.26, subdivision (c)(1), circumstances apply. As to the application of the beneficial parental relationship exception to Father, the court found: (1) as the parties agreed, Father had regular and consistent visits; (2) Father had not established that the Children felt a substantial positive emotional attachment; and (3) the safety, security, and stability of adoption "far outweighs any detriment of severance, which may be sadness."

Father appeals, arguing the Agency's ICWA inquiry was inadequate as to Father's siblings and challenging the court's ruling on the latter two prongs of the beneficial parental rights exception to adoption.

DISCUSSION

A. *ICWA*

Father contends the Agency failed to satisfy its duty of initial inquiry under section 224.2, subdivision (b), because it did not ask paternal uncle Kelly B., paternal aunt Debbie P., and paternal uncle Harold W. if they had Native American ancestry.[2] The Agency responds that the duty required by section 224.2, subdivision (b), does not apply and that it inquired of the available relatives.

Based on the information provided, the court concluded ICWA did not apply. "On appeal, we review the juvenile court's ICWA findings for substantial evidence." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051.) However, "where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*Ibid.*) In this case, the parties do not dispute the Agency's underlying actions, the only question is whether those actions satisfied its initial ICWA duty.

---

[2] In his opening brief, Father states "maternal grandparents were never asked about their potential ancestry." After the Agency's responding brief containing citations to the inquiry of maternal grandparents, however, Father abandons that argument on reply.

14

1. *ICWA Duty*

In juvenile dependency proceedings, under section 224.2, subdivision (a), the court and Agency "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300, 601, or 602 may be or has been filed, is or may be an Indian child." The following subsection instructs, "If a child is placed into the temporary custody of a county welfare department pursuant to Section 306 or county probation department pursuant to Section 307, the county welfare department or county probation department has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) ICWA defines " 'extended family member' " by "the law or custom of the Indian child's tribe" or, absent such law or custom, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c)[" 'extended family member' . . . defined as provided in [§] 1903" of [ICWA].)

There is currently a split in authority as to whether the second sentence of section 224.2, subdivision (b), requiring an expanded duty of inquiry, is limited to children who have been taken into temporary custody without a warrant pursuant to sections 306 or 307, and the Supreme Court has granted review to decide the question. (See *In re Delila D.* (2023) 93 Cal.App.5th 953, 971–973, review granted September 27, 2023, S281447 [concluding the expanded duty is not limited to custody *taken* under sections

15

306 and 307]; *In re Ja.O.* (2023) 91 Cal.App.5th 672, 678–679, review granted July 26, 2023, S280572 [concluding the expanded duty applies only in cases of custody taken under sections 306 or 307]; *In re Robert F.* (2023) 90 Cal.App.5th 492, 500–504, review granted July 26, 2023, S279743 [concluding the expanded duty applies only in cases of custody taken under sections 306 or 307].) In considering whether there was error, we analyze both lines of authority.

Applying *In re Ja.O.* and *In re Robert F.*, as the Agency urges, there was no expanded duty of inquiry, and thus no error, because the Agency did not take the Children into temporary emergency custody under section 306.

Under the *In re Delila D.* standard advanced by Father, however, the ICWA inquiry was inadequate as to Kelly B. and Debbie P. The Agency maintains it did not have a duty to inquire of Kelly B. because it sent a relative notification letter to him, and he did not respond. Even so, "it is possible the individuals would choose not to respond about placement but would respond to a question about [the child's] ancestry." (*In re Delila D., supra,* 93 Cal.App.5th at p. 976.)

As to Debbie P., the Agency argues it had no duty because Father did not provide contact information for her and the Agency had no contact with her. However, the Agency was aware that Debbie P. was Father's sibling and that Father had contact with her. Yet the Agency does not cite to evidence in the record suggesting that it made any attempt to obtain Debbie P.'s contact information from Father. Furthermore, Keri W., whom the Agency assessed for placement, had listed Debbie P. as an emergency contact, presumably with contact information. "[A] social services agency has the obligation to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian

16

status. [Citation.] The agency cannot omit from its reports any discussion of its efforts to locate and interview family members who might have pertinent information and then claim that the sufficiency of its efforts cannot be challenged on appeal because the record is silent." (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.) No such meaningful effort is evident here.

Consequently, if *In re Delila D.* is the correct authority, there was error under ICWA.[3]

2. *Harmless Error*

Assuming without deciding that the ICWA inquiry was inadequate under *In re Delila D.*, however, we conclude the error was harmless. When evaluating an ICWA inquiry for harmless error, this division has adopted the approach articulated in *In re Benjamin M.* (2021) 70 Cal.App.5th 735. (*In re Y.M.* (2022) 82 Cal.App.5th 901, 916.) Under *Benjamin M.*, "a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*In re Benjamin M.*, *supra*, at p. 744.)

Here, the Agency performed an ICWA inquiry of Father, paternal grandfather, and Father's sister Keri W. Paternal grandfather stated that no other relatives would have further information on any Native American ancestry. Given these inquiries, there is no indication in the record that inquiring of Father's two other siblings or Keri W.'s husband was likely to result in readily obtainable, meaningful information related to the Children's Indian status.

---

3      We decline to address whether the Agency had a duty to inquire of Harold W., a non-blood relative.

17

B. *Beneficial Parental Relationship Exception*

Father next argues that the court erred by declining to apply the beneficial parental relationship exception to adoption, instead of terminating his parental rights at the section 366.26 hearing.

At section 366.26 hearings, the court's goal is to select and implement a permanent plan for the Children. (*In re Caden C.* (2021) 11 Cal.5th 614, 630.) If "there has been a previous determination that reunification services be terminated" and the court "determine[s] by clear and convincing evidence . . . the child is likely to be adopted," the court must terminate parental rights unless a statutory exception (§ 366.26, subd. (c)(1)(B)(i)–(vi)) applies. (*In re Caden C., supra*, at pp. 630–631.)

Father argues the trial court erred by declining to apply the section 366.26, subdivision (c)(1)(B)(i), beneficial parental relationship exception, which requires a parent to prove three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C., supra,* 11 Cal.5th at p. 631.) The exception applies when " 'severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child." (*Id*. at p. 633.) In other words, "[w]hen the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child due to' the child's beneficial relationship with a parent." (*Id*. at pp. 633–634.) Throughout this analysis, "the focus is on the best interests of the child." (*Id*. at p. 632.)

18

The court explicitly addressed each of the three prongs established by *In re Caden C.*, properly analyzing them from the Children's perspective.

### 1. *Regular Visitation and Contact*

In examining the regular visitation and contact element, "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.) We review the court's determination as to this element for substantial evidence. (*Id.* at p. 639.)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*In re Caden C., supra,* 11 Cal.5th at p. 640.)

Applying the first element to the facts of this case, substantial evidence exists supporting the conclusion that Father maintained consistent visitation and contact with the Children. The Agency does not dispute this conclusion.

### 2. *Substantial, Positive Attachment*

Moving to the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent — the kind of attachment implying that the child would benefit from continuing the relationship." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 636.) Factors involved in determining the benefit of the relationship include " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " as well as "how children feel about, interact with, look to,

19

or talk about their parents." (*Id.* at p. 632.) "A positive attachment between parent and child . . . is nurturing and provides the child with a sense of security and stability," and "an emotional attachment is one where the child views the parent as more than a mere friend or playmate." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.)

While "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception," they may have a negative effect on the children such that they are relevant to determining the benefit of continuing the relationship. (*In re Caden C., supra,* 11 Cal.5th at pp. 637–638.)

Here, the court's conclusion that a substantial, positive, emotional attachment did not exist was based on the young age at which the Children were removed from custody of the parents and the Children's indication that they feel safe with and taken care of by the Caregivers, without mentioning Father. We review the court's determination on this element for substantial evidence. (*In re Caden C., supra,* 11 Cal. 5th at p. 639.)

In this case, substantial evidence supports the court's determination that the Children did not have a substantial, positive, emotional attachment to Father. The Children were two and three years old, respectively, when they were removed from the parents and spent an addition seven months with Father; at the section 366.26 hearing, the Children were five and six years old, meaning they spent nearly half of their lives out of the parents' custody. Neither child mentioned Father when asked who keeps them safe or takes care of them. C.B. did not include Father when asked with whom she would like to live, and she did not answer when asked how she would feel if she could no longer see Father.

The Children did enjoy visits with Father, suggesting positive interactions with Father. However, according to their therapist, the Children spoke more about the toys he brought than their relationship with him. Further, the Caregivers reported that the Children appeared less happy and their personalities were "shells of what they used to be" since returning to Father's care. Similarly, the Agency reported that, during home visits, the Children acted "recluse" and "quiet" in contrast to their previously "playful" and "energetic" personalities.

The record also demonstrates the Children experienced significant negative effects from interactions with Father arising out of his domestic violence, manipulation, and control issues. Although these issues, which led to the dependency, do not prevent application of the exception, *In re Caden C.* instructs that they are relevant to the benefits (or lack thereof) of continuing Children's relationship with Father.

Both children witnessed Father's domestic violence against Mother, and C.B. stated she knew to stay out of the room during such incidents because it would be "bad" to go in. Indeed, Father once pushed L.B. out of the way to get to Mother during a domestic violence incident. The Children also became entangled in Father's manipulation and control issues as he sought to hide unauthorized visits by Mother from the Agency. For example, C.B. lied to the social worker about Mother being present, and she became upset when Father ended up telling the truth. This evidence suggests that Father's struggles "mean[t] that interaction[s] between" him and the Children had "a ' "negative" effect' on" them such that the struggles "contributed to . . . a 'narrow' bond with" him. (*In re Caden C., supra*, 11 Cal.5th at pp. 637–638.)

21

Consequently, although there is evidence of some relationship between the Children and Father, there is substantial evidence supporting the court's finding that the attachment was not substantial, positive, and emotional.

### 3. *Detriment from Termination*

Despite affirming the court's decision based on the second element, we nonetheless address the final element. To determine whether "termination would be *detrimental,* the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*In re Caden C., supra*, 11 Cal.5th at p. 632.) This determination is based on "how the child would be affected by losing the parental relationship — in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Id.* at p. 634.) Some "relationship[s] involv[e] tangled benefits and burdens" which the court must "disentangl[e]." (*Ibid*.) Courts may "find that terminating a relationship with negative aspects would have some positive effects that weigh in the balance — and may tip it in favor of severing the parental relationship to make way for adoption." (*Id.* at p. 635.) As with the second element of the exception, the parent's struggles leading to dependency may be relevant to determining whether terminating the relationship would be detrimental to the child. (*Id.* at pp. 637–638 ["And issues such as those leading to dependency may also be relevant to the detriment from terminating parental rights."].)

We review underlying factual determinations for substantial evidence, but "the ultimate decision — whether termination of parental rights would be

detrimental to the child due to the child's relationship with his parent — is discretionary and properly reviewed for abuse of discretion." (*In re Caden C., supra,* 11 Cal.5th at p. 640.) "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. ' " ' [Citation.] But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*Id.* at p. 641.)

In this case, the court acted within its discretion in determining that the loss of the Children's relationship with Father would not outweigh the benefit of the security and stability of a new home. The existence of some harm to the Children from termination of Father's parental rights does not mandate the beneficial parental relationship exception; rather, as the court here properly recognized, *In re Caden C.* requires a balancing analysis between the harm caused to the Children by termination of rights and the benefits of adoption. (*In re Caden C., supra*, 11 Cal.5th, at p. 632.) Here, the Agency noted that the loss of fun times playing with Father would likely result in sadness or worry; nonetheless, the Agency concluded that the termination of Father's parental rights would not result in detriment to the Children that outweighs the benefits of adoption. The court agreed, determining "that benefits of adoption, the safety, the security, the stability far outweighs any detriment of severance, which may be sadness."

In so concluding, the court properly stated that Father's continuing struggle with control and manipulation is not a categorical bar to the application of the exception, but it is relevant to the benefit, or lack thereof, of continuing the relationship. Thus, we reject Father's assertion that the court improperly considered Father's domestic violence, control, and

23

manipulation issues.  Under *In re Caden C.*, eliminating the negative interactions resulting from Father's struggles, detailed above, would be a benefit of adoption.

Father notes that the Agency reported that termination of rights would not be detrimental "[o]nly with" therapy.  Contrary to Father's assertion, the record reflects that the benefit from termination outweighed the detriment without considering the therapy services; the Agency merely reported that the supportive services would assist the Children with handling any sadness "[a]dditionally" to the security and safety that the Children feel with the Caregivers.  And, in exercising discretion in the *In re Caden C.* balancing analysis, the court did not rely on the availability of therapy.  Therefore, the court did not abuse its discretion on this basis.

The court determined that the harm from terminating the Children's relationship with Father, sadness, did not outweigh the benefits of adoption, the safety and security of a new home free of exposure to domestic violence. This determination was not arbitrary, capricious, or patently absurd. Consequently, the court did not abuse its discretion in declining to apply the beneficial parental relationship exception, and we have no discretion to substitute any other decision.

DISPOSITION

We affirm the juvenile court's orders terminating Father's parental rights.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


KELETY, J.

25